UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DAMION HARTSFIELD, an individual,

Plaintiff,

v.

CITY OF SAN DIEGO; SCOTT WAHL, an individual; JUSTINE SMITH, an individual; ANGELA BULL, an individual; COUNTY OF SAN DIEGO; and DOES 1–14,

Defendants.

Case No.:  3:25-cv-01950-WQH-DEB

**ORDER**

HAYES, Judge:

The matters before the Court are: (1) the Motion to Dismiss filed by Defendant County of San Diego (ECF No. 9), (2) the Motion to Dismiss filed by Defendant City of San Diego (ECF No. 15), and (3) the Motion to Dismiss filed by Defendants Scott Wahl, Justin Smith, and Angela Bull (ECF No. 16).

## I.   BACKGROUND

On July 31, 2025, Plaintiff Damion Hartsfield ("Plaintiff") filed a Complaint against Defendants City of San Diego (the "City"); Scott Wahl ("Wahl"), Justine Smith ("Smith"),

1

Angela Bull ("Bull") (collectively, "Supervisor Defendants"); County of San Diego (the "County"); and Does 1–14. (Compl., ECF No. 1.)

On August 22, 2025, the County filed a Motion to Dismiss Plaintiff's Complaint ("County's Motion to Dismiss"). (ECF No. 9.) On September 22, 2025, Plaintiff filed a Response in Opposition. (ECF No. 13.) On September 29, 2025, the County filed a Reply. (ECF No. 14.)

On October 3, 2025, the City filed a Motion to Dismiss Plaintiff's Complaint ("City's Motion to Dismiss"). (ECF No. 15.) On October 20, 2025, Plaintiff filed a Response in Opposition. (ECF No. 17.) On October 27, 2025, the City filed a Reply. (ECF No. 20.)

On October 3, 2025, the Supervisor Defendants filed a Motion to Dismiss Plaintiff's Complaint ("Supervisor Defendants' Motion to Dismiss"). (ECF No. 16.) On October 20, 2025, Plaintiff filed a Response in Opposition. (ECF No. 18.) On October 27, 2025, the Supervisor Defendants filed a Reply. (ECF No. 16.)

## II.    ALLEGATIONS IN THE COMPLAINT

This case concerns the arrest, detention, and treatment of Plaintiff by officers of the San Diego Police Department. It also involves the dissemination of Plaintiff's booking photo to his coworkers by County deputies.

### A. The Parties

Plaintiff is a 45-year old man who lives in San Diego. (Compl. ¶ 9.) Defendant Wahl was the Chief of Police of the San Diego Police Department ("SDPD") at the time of the incident. *Id.* ¶ 10. Defendants Smith and Bull were SDPD sergeants and supervisors of the SDPD's downtown Bike Team at the time of the incident. *Id.* ¶¶ 11, 28. Defendants Smith and Bull "were present" during Plaintiff's arrest and either participated in it or permitted their subordinates to arrest Plaintiff. *Id.* ¶ 28.

Does 1–12 were SDPD officials and other agents of the City at the time of the incident. *Id.* ¶ 12. Does 13–14 were County Sheriff's employees at the time of the incident. *Id.* ¶ 13.

2

## B. Plaintiff's Detention and Arrest

On New Year's Day, 2025, Plaintiff was celebrating in downtown San Diego. *Id.* ¶ 16. At around 1:30 a.m., Plaintiff and his date were walking down Fifth Avenue back to their hotel. *Id.* ¶ 18. Dozens of other pedestrians were standing on the street, walking and talking. *Id.* ¶ 19.

Plaintiff stopped to "chitchat[]" with a police officer. *Id.* ¶ 21. "In the middle of his conversation, [Plaintiff] heard a faint voice say, 'Clear the area.' It was not possible for him to discern from where the voice came from or" who it was addressing. *Id.* ¶ 22. "As he was finishing up his conversation with the police officer so that he could return to his hotel with his date, [Plaintiff] was suddenly grabbed and handcuffed behind his back." *Id.* ¶ 23.

Although "no one had created a disturbance or obstructed the street," officers handcuffed Plaintiff. *Id.* ¶ 24. Plaintiff heard a voice say, "[W]ell, you didn't listen." *Id.* ¶ 26. "There was no explanation as to what" Plaintiff was supposed to listen to, and "[t]here had been no commands or warnings given to him." *Id.* Plaintiff had not obstructed anyone on the sidewalk, was not impaired, and could walk, stand, and speak without difficulty. *Id.* ¶ 27.

## C. Plaintiff's "Rough Ride" to the Jail

Officers placed Plaintiff and other handcuffed individuals in a van that "remained stationary for approximately 30–45 minutes" before taking off "suddenly" and stopping at a "random dark street" to "let all the other detainees out of the van except [Plaintiff]." *Id.* ¶¶ 29–30.

Plaintiff remained handcuffed but "he was never secured by a seatbelt or anything else to the interior of the van for safety purposes." *Id.* ¶¶ 32–33. "The transport van accelerated at a high rate of speed and then aggressively stopped, at which point [Plaintiff] was forcibly tossed onto the van floor, landing on his back and right shoulder while handcuffed and unable to brace himself." *Id.* ¶ 33. Plaintiff "laid in pain for approximately 15 minutes as the van continued to drive." *Id.* ¶ 35.

3

3:25-cv-01950-WQH-DEB

The van eventually stopped, and an officer told Plaintiff to "[g]et up." *Id.* Plaintiff "told the officer that he could not move. The officer then dragged [Plaintiff] out of the van and took him to the processing area of the San Diego [Central] Jail" (the "Jail"). *Id.* ¶ 36. The officers picked Plaintiff up on Fifth Avenue, which is only a "four-minute drive" from the Jail. *Id.* ¶ 37.

The officers arrested Plaintiff under California Penal Code 647(f), which criminalizes public intoxication when an individual is "in a condition that they are unable to exercise care for their own safety." *Id.* ¶ 34.

### D. Plaintiff's Arrival at the Jail and Booking Photo

When Plaintiff arrived at the Jail, he was "running on fear and adrenaline from the rough ride" and felt confused, anxious, and in "increasing pain from his shoulder." *Id.* ¶¶ 38–39. Jail staff took Plaintiff's fingerprints and booking photo, processed him, and placed him in a cell. *Id.* ¶ 42. Plaintiff believed "a terrible mistake had been made and that someone would immediately release him when they discovered their mistake," but "[n]o one came." *Id.* ¶ 43.

While Plaintiff waited in his cell, County employees Does 13–14 "accessed [Plaintiff's] booking photograph via JIMS while on duty and photographed and texted it to third parties, including [Plaintiff's] coworkers." *Id.* ¶ 44. They texted the photo "knowing that doing so would violate [Plaintiff's] right to privacy," intending to "harass and humiliate" Plaintiff and "punish" him. *Id.* ¶ 45. "No compelling public safety or law enforcement interest" justified the distribution of Plaintiff's booking photo. *Id.* ¶ 46.

### E. Plaintiff's Pain and Release from Jail

"After several hours, [Plaintiff] started to experience extreme pain in his right shoulder and chest area." *Id.* ¶ 47. He pushed the call button in his cell and told the deputy that he felt shortness of breath and chest pain. *Id.* The deputies took him to the nurse's unit, where he received an EKG. *Id.* ¶ 48. Plaintiff "was in horrible pain." *Id.* "After the EKG, [Plaintiff] was escorted back to his cell and eventually released from custody after another two to three hours." *Id.*

Plaintiff was released from the Jail at 11:15 a.m. pursuant to Penal Code 849(b)(2). *Id.* ¶ 49–50. He had a fractured shoulder. *Id.* ¶ 50.

"When he returned to work, [Plaintiff's] arrest was fodder for office gossip." *Id.* ¶ 51. His booking photo, "distributed by Does 13–14[,] had made its way around [Plaintiff's] work place and was even made into a widely circulated meme." *Id.* This caused Plaintiff ridicule, humiliation, and harm to his reputation. *Id.*

### F. The County's Policy Regarding Distribution of Booking Photos

"In the County jails, deputies have constant access to detainees' booking photographs." *Id.* ¶ 148. "All booking photographs are stored in the Jail's electronic system [('JIMS'),] which is designed to share information among all [J]ail staff." *Id.* Deputies can access booking photographs via JIMS at any time. *Id.* "Booking photos are displayed on each arrestee's 'Facecard,' a physical identification card which includes booking photographs,[] and other personal identifying information, such as scars and tattoos." *Id.* ¶ 149. Deputies access booking photos on a daily basis, using detainees' Facecards daily to verify their identities. *Id.* Deputies also routinely use their cell phones during their shifts at the Jail to time safety checks. *Id.* ¶ 150.

California Penal Code § 13665 prevents sheriff's departments from "shar[ing], on social media, booking photos of an individual arrested on suspicion of committing a nonviolent crime . . . ." *Id.* ¶ 152. Penal Code § 13365(d)(2)'s definition of "social media" includes "instant and text messages." *Id.* ¶ 153. The County's written policy, Procedure 7.14, states: "Social Media includes, but is not limited to, Instagram, Facebook, Twitter, LinkedIn, Nixle, Wikipedia, blogs, etc." *Id.* ¶ 154. The County's written policy (in contrast to Penal Code § 13665(d)(2)) does not include text messages in its definition of "social media." *Id.*

Does 13–14's "act of texting Mr. Hartsfield's booking photo to his colleague, and the resulting constitutional violation, was a highly predictable consequence" of the County's failure to "enact a policy and train and supervise its personnel to comply with California state law." *Id.* ¶ 157.

**G. SDPD's History of Misconduct**

The SDPD "has a long history of the use of excessive and unnecessary force," and of "supervisors acquiescing to the misconduct of their subordinates." *Id.* ¶ 52.

### 1. History of Misconduct in Downtown San Diego

The SDPD "was well aware of the long and troubling history of officers patrolling the downtown and the Gaslamp area in which victims, bystanders and community members had complained of excessive force and false arrest." *Id.* ¶ 53. SDPD officers "were known to target" young Black or Hispanic men. *Id.* ¶ 54.

Between approximately 2015 and 2024, several incidents occurred involving SDPD officers and Black men in downtown San Diego. *See id.* ¶¶ 55–64. Defendants Smith and Bull "were well aware of this repeated unconstitutional conduct[,] [w]ere present during these unlawful arrests[,] and failed to properly supervise or intervene." *Id.* ¶ 65.

On May 28, 2017, SDPD officers arrested a Black man named Michael Lee without probable cause in downtown San Diego. Mr. Lee was "standing on the sidewalk talking on his cell phone" when officers slammed him to the ground, broke his humerus bone, put a knee on his back, and choked him while he was on the ground. *Id.* ¶ 55 (citing *Lee v. City of San Diego*, No. 3:18-cv-00159-W-BLM (S.D. Cal.)). "The City paid $1.35 million to settle the case," but the SDPD did not change its practices. *Id.*

In 2015, a jury awarded compensatory and punitive damages to a Black Marine who was sucker punched in downtown San Diego. Even though he "was the victim of the crime, the police officers threw him down" and booked him into jail. *Id.* ¶ 56.

On July 9, 2023, a Black man named Muslah Muhammad Abdul Hafeez was trying to retrieve his phone from his car when officers from the SDPD Bike Team pointed a gun at him, jumped on him, kneeled on him, and pulled him by the handcuffs over his head, causing him serious injuries and bruising. *Id.* ¶ 57. The officers did not tell him why they arrested him and "the District Attorney never filed charges." *Id.* The SDPD took no action. *Id.*

6

On November 19, 2023, a Black man and a white man "were about to engage in a physical altercation" in downtown San Diego. Video footage[1] shows that SDPD officers approached the Black man with guns drawn and tackled him, even though he was already kneeling in a compliant position, but they "issued no commands to the [white] man and [] did not engage him." The SDPD received this footage but took no action. *Id.* ¶ 58.

On July 21, 2024, a Black man named Travis Stocking Jr. was walking down Fifth Avenue when an officer told him, "You didn't hear what I said, I said get on the sidewalk." The officer asked for Mr. Stocking's ID and said he smelled alcohol on his breath, even though Mr. Stocking had not been drinking. The officer arrested Mr. Stocking and kept him in jail for four hours. The SDPD took no action. *Id.* ¶ 59.

Video footage[2] taken on August 19, 2024 demonstrates that a Black man had his hands raised and was walking away from an SDPD Bike Team officer when the officer shoved him down, "causing him to almost strike his head on the concrete curb." "Witnesses reported that this victim posed no threat to anyone at the time he was attacked by the police." *Id.* ¶ 60.

Local news footage shows two more Black men being assaulted by SDPD officers on the same day as the above incident. Officers punched one man and shoved his face into the pavement with an elbow. *Id.* ¶ 61. They also pepper sprayed a group of people who were not doing anything illegal. When one of those people spit in their direction, "four officers charged him and took him to the ground violently." When the SDPD received this video footage, it "took no action and blamed the victims." *Id.* ¶ 62.

"Around the same time, another Black male named Rodku Smith reported that he was tackled while speaking to a police officer, attempting to get the officer's help. Mr.

---

[1] Compl. ¶ 58 (citing *SDPD Bike Team Member Using Excessive Force Against Compliant Black Man*, YouTube (Mar. 16, 2025), https://youtube.com/shorts/_vjvGx-iNzU).

[2] Compl. ¶ 60 (citing *SDPD Bike Team Using Excessive Force Against Rodku Smith*, YouTube (Mar. 16, 2025), https://youtube.com/shorts/E-jmqEQq1sE).

Smith had committed no crimes." The SDPD received the footage and took no action. *Id.* ¶ 63.

Video footage[3] from September 12, 2024 shows that a Black man who had committed no crime was walking in a downtown parking lot when an officer almost ran him over with a bicycle and "several officers attack[ed] him without warning." The man put his hands up, "immediately saying 'okay, okay, okay.'" The SDPD Bike Team captain told the media that no misconduct occurred. The officers cited the man with obstruction and resisting an officer. *Id.* ¶ 64.

### 2. Studies Concerning SDPD's Disparate Treatment of Black People

Between approximately 2016 and 2021, studies and reports revealed racial disparities in San Diego law enforcement, including that: "Black individuals were disproportionately subjected to searches and questioning after being stopped by SDPD officers," Black people were more likely to face prosecution for minor drug offenses, and the SDPD "stopped Black individuals at more than double the rate of [white] people, with a higher likelihood of searches, arrests, and the use of force." *Id.* ¶¶ 66–74. "These studies and reports were provided to the [City] and the [SDPD], giving them notice of the disparate treatment of Black individuals." *Id.* ¶ 68. But the SDPD "took no action to change the culture of singling out [Black men] by the Bike Team." *Id.* ¶ 75.

### 3. Prior Misconduct by Specific Officers

The SDPD has a culture of covering up misconduct and excessive force incidents, instead of engaging in independent investigations. *Id.* ¶ 95. For instance, between 2010 and 2017, several SDPD officers arrested individuals without cause and used excessive force multiple times. *See id.* ¶¶ 76–78, 83, 85, 88–89, 92–93. In one of these cases, a federal district court found that the officers unlawfully arrested one of the victims without probable

---

[3] Compl. ¶ 64 (citing ABC 10 News, *SDPD Addresses Recent Viral Arrest Video in the Gaslamp*, YouTube (Sept. 12, 2024), https://www.youtube.com/watch?v=YEtlFRWUpIs).

cause. *Id.* ¶ 81. The SDPD failed to discipline or retrain these officers and promoted some of the officers. *Id.* ¶¶ 79, 80–82, 84, 86–87, 94, 102, 128–29.

### 4. Code of Silence

The SDPD was aware of the "code of silence" among its officers. *Id.* ¶ 103. The Supervisor Defendants knew about this code of silence, including that "their subordinates were routinely covering up for fellow officers' misconduct [,] engaging in retaliatory action against innocent citizens," and "charging innocent people with resisting arrest." *Id.* ¶¶ 190–92. Officers who committed misconduct "were consistently promoted to supervisory roles in which they would train and supervis[e] the newer officers." *Id.* ¶ 194.

A 2014 lawsuit made the SDPD aware of its culture of covering up misconduct. *Id.* ¶ 105, 114. That case involved an officer who had a reputation for sexually assaulting women while on duty for years. *Id.* ¶¶ 107–13. Former officers testified that the SDPD often "swept [misconduct] under the rug." *Id.* ¶¶ 110–12.

In 2021, Captain Alberto Leos "discovered documents were illegally forged under his name by other officers within the Department in order to cover up or to reduce punishment for officer misconduct." *Id.* ¶ 130. When he tried to report the forgeries, his supervisors told him to "go along with the program." *Id.* ¶¶ 133–34. An investigator with the City Attorney's Office told Captain Leos that he could not substantiate the forgery allegations and that he was "looking out for the department heads and the city." *Id.* ¶¶ 141–42.

### 5. Reporting About Lack of Reforms

In 2020, the Voice of San Diego news organization reported that the SDPD failed to implement reforms regarding officer accountability. *Id.* ¶¶ 115–20. In 2023, "inewsource and KPBS" reported that one-third of the SDPD's public reports on officer misconduct "were missing disciplinary records." *Id.* ¶¶ 121–24. Those cases missing disciplinary records involved excessive force and discrimination, including rampant racism against fellow officers. *Id.* ¶¶ 125–26, 144. The City "was well aware of the longstanding problems

of the culture of violence and the institutional failure to investigate and discipline officers who engage in serious misconduct." *Id.* ¶ 208.

### H. Summary of the Claims

Plaintiff brings three Fourth Amendment claims under 42 U.S.C. § 1983 against the Doe Defendants involved in his arrest, detention, and transportation to the Jail: (1) wrongful detention, (2) false arrest, and (3) excessive force. Plaintiff also brings a § 1983 claim for failure to supervise and discipline against the Supervisor Defendants and *Monell* claims against the City and the County.

Plaintiff brings seven claims under California state law: (1) negligence, against all Defendants; (2) negligence per se, against the County and Does 13–14; (3) battery, against Does 6–7; (4) false arrest and imprisonment, against Does 1–7; (5) violation of the Bane Act, against the City, the Supervisor Defendants, and Does 1–12; (6) invasion of privacy, against the County and Does 13–14; and (7) intentional infliction of emotional distress, against Does 1–7 and 13–14.

### III.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under FRCP Rule 12(b)(6) "is proper only where there is no cognizable legal theory[,] or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

3:25-cv-01950-WQH-DEB

alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). While a pleading "does not require 'detailed factual allegations,'" FRCP Rule 8 nevertheless "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

## IV.   DISCUSSION

### A. *Monell* **Municipal Liability**

#### 1.  Legal Standard

Municipalities are considered "persons" under § 1983 and therefore may be liable for causing a constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality, however, "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

> In order to establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right;

and, (4) that the policy is the moving force behind the constitutional violation."

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alteration in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

A plaintiff can satisfy *Monell*'s policy requirement under one of three theories: (1) a formal, "expressly adopted official policy," (2) a "longstanding practice or custom," or (3) when the person who committed the violation was "an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) (quotations and citations omitted).

Historically, the Ninth Circuit allowed plaintiffs to plead a *Monell* claim with nothing more than "a bare allegation that government officials' conduct conformed to some unidentified government policy or custom." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). However, following the decisions in *Iqbal* and *Twombly*, the Ninth Circuit clarified that *Monell* claims must include sufficient allegations to provide fair notice to the opposing party and to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quotations and citation omitted).

### 2. The City[4]

Plaintiff alleges a *Monell* claim against the City based on a municipal policy, custom, or practice theory of liability. (Compl. ¶¶ 204–14.) The City contends that Plaintiff fails to state a *Monell* claim against it because he "identifies no policy and alleges no sufficiently similar pattern of unlawful conduct." (ECF No. 15-1 at 8.)

#### i. Formal Policy

[4] The City contends that body camera footage of the incident "depicts a materially different sequence of events than alleged in the complaint." (ECF No. 15-1.) The Court declines to address this argument at this stage of the proceedings because it must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party" when ruling on a motion to dismiss. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The City first contends that Plaintiff fails to allege a formal City policy that was the moving force behind his constitutional injury. (ECF No. 15-1 at 10.) Plaintiff responds that he "is not required to allege formal City policy to support his *Monell* claim." (ECF No. 17 at 8.) "An unconstitutional policy need not be formal or written to create municipal liability under Section 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law." *Gordon*, 6 F.4th at 974 (quotations and citations omitted). Plaintiff's failure to allege a formal City policy that caused his injury does not defeat his *Monell* claim.

### ii.    Custom or Practice

The City next contends that "Plaintiff fails to allege a custom or practice *related to his case* to establish *Monell*" liability. (ECF No. 15-1 at 12.) The City contends that Plaintiff's allegations of past SDPD behavior are too dissimilar from this case to establish a policy or custom. *Id.* Plaintiff contends that these prior incidents put the City "on notice that SDPD officers routinely target African American males, subject them to excessive force and false arrest[,] and then are shielded from repercussions by institutionalized cover ups." (ECF No. 17 at 10.)

Because Plaintiff does not allege the existence of a formal or express policy, the Court applies the "longstanding practice or custom" theory of Monell liability. *Gordon*, 6 F.4th at 974. To qualify as a municipal policy under *Monell*, a custom must be "so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* at 918 (citations omitted). When a plaintiff seeks to establish a custom based on a municipality's "failure to act, [he] must allege that the municipality exhibited deliberate indifference to the violation of [his] federally protected rights." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). If the policy "is not obviously, facially deficient," plaintiffs

13

must demonstrate a "pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Id.* at 1142.

In support of his *Monell* custom or practice claim, Plaintiff alleges that the City exhibited deliberate indifference to three general categories of prior actions by SDPD officers: (1) using excessive force and engaging in retaliatory arrests, Compl. ¶ 204, (2) detaining people without cause, *id.* ¶ 205, and (3) racially targeting Black men in downtown San Diego, *id.* ¶ 206. Plaintiff cites several prior incidents of alleged misconduct by SDPD officers against Black men in downtown San Diego. *Id.* ¶¶ 55–65. The City contends that these incidents fail to establish a *Monell* custom because they are factually distinguishable, they lack context, they occurred too long ago, and Plaintiff does not allege enough of them.

First, the City contends that because Plaintiff does not allege a racial discrimination claim, allegations of the SDPD's past racial discrimination are not relevant to his *Monell* claim.[5] (ECF No. 15-1 at 11–12.) "The threshold question as to whether Plaintiff can establish *Monell* liability is whether a constitutional violation has occurred." *Abdul-Hafeez v. City of San Diego*, No. 24-cv-1184-RSH-DDL, 2025 WL 696993, at *7 (S.D. Cal. Mar. 4, 2025) (quotations and citations omitted) (dismissing *Monell* claims based on underlying First Amendment and equal protection violations because plaintiff failed to adequately plead those underlying violations). Plaintiff does not allege an underlying constitutional claim related to racial discrimination. The Court concludes that the allegations of prior racial profiling or targeting by SDPD officers are irrelevant to Plaintiff's *Monell* claim.

Second, the City contends that the alleged prior incidents are irrelevant to this case because they do not "involve a pedestrian stop or van transport comparable to Plaintiff's alleged incident[]," and thus are factually distinct. (ECF No. 20 at 2.) "To evaluate whether a sufficient pattern of unconstitutional conduct exists, courts typically consider the number

---

[5] The City also contends that "Plaintiff never alleges he himself is African American." (ECF No. 15-1 at 11.) However, Plaintiff alleges that he smiled when Jail staff took his booking photo because "he did not want to be 'yet another angry Black man' in a mugshot." (Compl. ¶ 40.) This allegation supports the reasonable inference that Plaintiff is Black.

3:25-cv-01950-WQH-DEB

of incidents, the factual similarity of those incidents, their timing, and any subsequent action by the defendant." *Hightower v. Cnty. of San Diego*, No. 24-cv-1152-RSH-MSB, 2025 WL 824368, at *6 (S.D. Cal. Mar. 14, 2025) (citations omitted). The incidents must be "substantially similar in character to establish a *Monell* claim." *Raudelunas v. City of Vallejo*, No. 2:21-cv-00394, 2022 WL 329200, at *8 (E.D. Cal. Feb. 3, 2022) (citing *McCoy v. City of Vallejo*, No. 2:19-cv-001191-JAM-CKD, 2020 WL 374356, at *4 (E.D. Cal. Jan. 23, 2020)).

Here, Plaintiff alleges at least five prior incidents of SDPD officers arresting individuals in downtown San Diego without probable cause or when the individuals had not committed a crime. (*See* Compl. ¶¶ 55, 56, 57, 59, 64.) He also alleges at least six prior incidents of SDPD officers using force that could plausibly be considered excessive during arrest. *See id.* ¶¶ 55, 57, 58, 60, 61, 62. Eight of those incidents allegedly occurred within two years before Plaintiff's arrest. *See id.* ¶¶ 57, 58, 59, 60, 61, 62, 63, 64. Plaintiff alleges that the SDPD knew about these incidents but did nothing. *See id.* Although the factual circumstances in those incidents may not "perfectly match the circumstances alleged here," the Court finds the prior incidents similar enough to this case to sufficiently plead that (1) the City has a custom of SDPD officers arresting individuals without cause and using excessive force; (2) that custom amounts to deliberate indifference to Plaintiff's Fourth Amendment rights; and (3) the custom was the moving force behind Plaintiff's injuries. *Wright v. Cnty. of San Bernadino*, No. 5:24-cv-01123-JLS-JC, 2025 WL 546362, at *4 (C.D. Cal. Jan. 14, 2025); *see also Weaver v. City of Stockton*, No. 2:20-cv-00990-JAM-EFB, 2020 WL 5763763, at *8 (E.D. Cal. Sept. 28, 2020) (citations omitted) ("A custom can be 'inferred from . . . evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'").

Third, the City contends that the alleged prior incidents cannot establish a *Monell* custom because Plaintiff fails to provide factual context about these incidents or "proof" that unconstitutional conduct occurred. (*See* ECF No. 15-1 at 13–15.) However, "proof of prior adjudicated constitutional violations is [] not required" to state a *Monell* claim at the

15

3:25-cv-01950-WQH-DEB

motion to dismiss stage. *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1080 (S.D. Cal. 2023) (citing *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021)); *see also Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *5 (E.D. Cal. Oct. 13, 2020) (citation omitted) ("Prior incidents involving lawsuits alone, even those which do not result in a finding or admission of wrongdoing, can be sufficient for *Monell* liability purposes in the face of a motion to dismiss."). Plaintiff sufficiently alleges facts about the prior incidents supporting a reasonable inference that SDPD officers wrongfully detained, falsely arrested, or used excessive force during arrest.

Fourth, the City contends that Plaintiff fails to allege a sufficient number of prior incidents to establish a *Monell* custom. (ECF No. 20 at 4.) "While one or two incidents are insufficient to establish a custom or policy" under *Monell*, the Ninth Circuit has "not established what number of similar incidents would be sufficient to constitute a custom or policy." *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (citations omitted). Courts in this Circuit are "somewhat split . . . on the number of similar unconstitutional incidents a plaintiff must show to establish a longstanding practice or custom." *Est. of Kong ex rel. Kong v. City of San Diego*, No. 22-cv-1858-BAS-DDL, 2023 WL 4939370, at *6 (S.D. Cal. Aug. 2, 2023) (quotation and citation omitted). At this stage of the proceedings, the Court finds that Plaintiff alleges enough prior incidents to establish the existence of a *Monell* custom. *See Abdul-Hafeez*, 2025 WL 1677782, at *9 (finding four prior incidents sufficient to allege a *Monell* custom of the SDPD's discrimination against Black individuals).

### iii.   Captain Leos Allegations

The City moves to strike Plaintiff's allegations regarding Captain Leos and corruption within the SDPD under Federal Rule of Civil Procedure 12(f).[6] (ECF No. 15-1 at 26.) The City contends that the Captain Leos allegations are irrelevant because they

---

[6] The Supervisor Defendants also move to strike the Captain Leos allegations, for the same reasons. (ECF No. 16-1 at 14–15.)

concern "internal discipline and personnel disputes within the City," not constitutional violations related to Plaintiff's *Monell* claim. *Id.* The City further contends that Plaintiff fails to show how the corruption and cover-ups alleged by Captain Leos were the moving force behind Plaintiff's injury. *Id.* Plaintiff contends that the Captain Leos allegations "create a strong inference that there was an entrenched 'program' . . . within the [SDPD] in which the chain of command falsified records to cover up for their subordinates," and that this was the "moving force behind the culture in which officers acted with impunity without fear of investigation or consequences." (ECF No. 17 at 15.)

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike under Rule 12(f) are "generally disfavored" and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Rosales v. Cnty. of San Diego*, 511 F. Supp. 3d 1070, 1083 (S.D. Cal. 2021) (quotations and citations omitted).

At this stage of the proceedings, the Court declines to strike the Captain Leos allegations from Plaintiff's Complaint. *See Lobaton v. City of San Diego*, No. 3:15-cv-1416-GPC-DHB, 2015 WL 7864186, at *3 (S.D. Cal. Dec. 2, 2015) (declining to strike allegations of unrelated SDPD officers' repeated sexual assaults from complaint in unlawful arrest case with *Monell* claim). The Court makes no finding as to the relevance of the Captain Leos allegations in any further proceedings in this case, such as summary judgment or trial.

#### iv.    Additional Custom or Practice Allegations

The City raises several objections to Plaintiff's other allegations supporting his *Monell* custom claim, including: the incidents involving Officers Savage, McClain, and Browder, *see* Compl. ¶¶ 76–94; the studies and news reports describing racial disparities in law enforcement and SDPD's failure to implement reforms, *see id.* ¶¶ 66–75, 115–29; and the "code of silence" within the SDPD, *see id.* ¶¶ 103–14. The Court declines to address these objections at this stage of the proceedings because, as discussed, it finds that

17

Plaintiff's description of the prior SDPD arrests in downtown San Diego sufficiently alleges a *Monell* custom of detaining individuals without cause and using excessive force during arrest.

Drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff adequately pleads his *Monell* claim against the City at this stage of the proceedings. The City's Motion to Dismiss (ECF No. 15-1) is denied as to the *Monell* claim.

### 3. The County

Plaintiff brings a *Monell* claim against the County based on two theories: (1) failure to train and (2) deficient policy. (Compl. ¶¶ 215–19.) The County moves to dismiss Plaintiff's *Monell* claim against it. (ECF No. 9-1 at 12–16.)

#### i.    Request for Judicial Notice

The County submits a Request for Judicial Notice in support of its Motion to Dismiss. (ECF No. 9-2.) The County requests the Court to take judicial notice of (1) the Government Claim Plaintiff submitted to the County, *see* Compl. ¶ 5, (2) Sheriff's Department Policy 7.14,[7] *see id.* ¶ 154, and (3) the Sheriff's Department's "Who's in Jail" website[8] that allows the public to look up people incarcerated in County jails. *Id.* at 2.

Federal Rule of Evidence 201 provides that courts may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b). "[A] court may take judicial notice of matters of public record." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quotations and citation omitted). The Court takes judicial notice of Sheriff's Department Policy 7.14 and the "Who's in Jail" website because they exist on public government websites. The Court takes judicial notice

---

[7] *7.14 Social Media*, San Diego County Sheriff's Office – Policy Section, https://www.sdsheriff.gov/home/showpublisheddocument/9365/638880924367530000%20at%2067 (accessed March 9, 2026).

[8] *Sheriff's Who is in Jail*, San Diego County Sheriff's Office, https://apps.sdsheriff.net/wij/ (accessed March 9, 2026).

of Plaintiff's Government Claim because he presented it to the County and does not object to the County's judicial notice request. (*See* ECF No. 9-2, Ex. A.) Plaintiff's Claim states, in part, that "an employee of the County sent booking photos of [Plaintiff] to others, including [Plaintiff's] coworkers at the Department of Homeland Security." *Id.* at 9.

ii.    Sufficiency of Allegations Against Does 13–14

The County contends that Plaintiff's *Monell* claim should be dismissed because Plaintiff fails to sufficiently allege the challenged conduct: that Does 13–14 are County Sheriff's deputies who texted Plaintiff's booking photo to his coworkers. (ECF No. 9-1 at 11.) Specifically, the County contends that Plaintiff fails to allege enough facts to support that inference, such as the phone number that sent the text or which of Plaintiff's coworkers received the text. (ECF No. 9-1 at 10–11.)

The County asserts that the JIMS system containing Plaintiff's booking photo "is part of a widely used interagency database accessible [] by many state and Federal law enforcement agencies." *Id.* at 11. The County does not provide any evidence supporting this assertion. The County theorizes that Plaintiff's coworkers at the Department of Homeland Security or employees of other government entities could have accessed Plaintiff's booking photo through JIMS, and contends that Plaintiff fails to establish that Does 13–14 texted the photo to Plaintiff's coworkers.[9] *See id.* In response, Plaintiff contends that the Court must accept his factual allegations about Does 13–14 as true at the motion to dismiss stage. (ECF No. 13 at 11.)

Plaintiff alleges that, "as [he] waited in his cell, Does 13–14, employees of the County, accessed Mr. Hartsfield's booking photograph via JIMS while on duty and photographed and texted it to third parties, including Mr. Hartsfield's coworkers." (Compl.

---

[9] The County also contends for the first time in its reply brief that Plaintiff's failure to adequately investigate the source of the text message raises Article III standing issues and violates Plaintiff's counsel's duty under Federal Rule of Civil Procedure 11. (ECF No. 14 at 4–6.) The Court declines to address these arguments because the County failed to raise them in its opening brief and they do not change the Court's conclusion. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

19

¶ 44.) Plaintiff further alleges that, when he returned to work after his release from the Jail, the "booking photo distributed by Does 13–14 had made its way around Mr. Hartsfield's work place and was even made into a widely circulated meme." *Id.* ¶ 51.

The Court finds these allegations specific enough to constitute factual allegations that it must accept as true at this stage of the proceedings, instead of mere "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. Because County employees booked Plaintiff into the Jail, took his booking photo, and had the ability to access that booking photo via JIMS, it is plausible that they disseminated the photo to his coworkers via text.

### iii.    Failure to Train

The County contends that Plaintiff fails to establish *Monell* liability based on a failure to train theory because he does not "allege any knowledge of comparable employee misconduct in the past." (ECF No. 9-1 at 16.) Plaintiff contends that because the handling of booking photos is a "common occurrence involving every single employee of the San Diego jails," the texting of Plaintiff's booking photo to a third party was a "highly predictable consequence" of failing to train staff that California law prohibits texting booking photos. (ECF No. 16).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *City of Oklahoma City v. Tuttle*, 571 U.S. 808, 822 (1985)). "Failure to train may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Dougherty*, 654 F.3d at 900 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). To establish that a municipality had notice of a constitutional deficiency in its training, "it is 'ordinarily necessary' for a plaintiff to demonstrate a 'pattern of similar constitutional violations by untrained employees.'" *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (quoting *Connick*, 563 U.S. at 62).

However, "in a narrow range of circumstances, a particular showing of obviousness can substitute for the pattern of violations" usually needed to establish municipal liability. *Id.* (quotations and citation omitted). In these "rare" situations, the constitutional violations resulting from a failure to train must be "so patently obvious" and a "highly predictable consequence" of the deficient training program. *Connick*, 563 U.S. at 63–64 (citing *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). "A single unconstitutional incident, without more," does not "establish that a municipality failed to provide proper training." *Kirkpatrick*, 843 F.3d at 796 (citations omitted).

Here, Plaintiff does not allege that the County had notice of a pattern of similar constitutional violations by untrained employees. *See Connick*, 563 U.S. at 62. The Court accordingly must determine whether Plaintiff sufficiently alleges his single-incident theory of *Monell* liability—that unconstitutional consequences of the County's failure to train its deputies on the dissemination of booking photos were so "patently obvious" as to constitute deliberate indifference.

In *Canton*, the Supreme Court "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* (citing *Brown*, 520 U.S. at 409). The Court "posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id.* (citing *Canton*, 489 U.S. at 390 n.10). In that scenario, involving officers who "must sometimes make split-second decisions with life-or-death consequences," the Court "theorized" that the "unconstitutional consequences of failing to train [the officers] could be so patently obvious" that a failure to do so would amount to deliberate indifference. *Id.*

This case does not fall into the "narrow range of circumstances" giving rise to single-incident liability. Unlike the hypothetical scenario raised in *Canton*, this case does not involve County employees making "split-second decisions with life-or-death consequences." *Connick*, 563 U.S. at 64. Plaintiff alleges that Does 13–14's "act of taking

3:25-cv-01950-WQH-DEB

and disseminating [his] booking photo via text message when there was no compelling public safety or law enforcement interest deprived [Plaintiff] of his substantive due process right to not be subjected to punishment before adjudication of guilt." (Compl. ¶ 146.) He alleges that the County knew that "[d]eputies routinely access booking photos in the course of their duties on a daily basis," such as during safety checks and to verify detainees' identity. *Id.* ¶¶ 149–50, 155. Plaintiff further alleges that, "[g]iven the frequency with which deputies are confronted with handling booking photos, it was obvious to the County that misuse of the booking photos was a probability without proper training and guidance on the state law." *Id.* ¶ 150.

The Court finds these allegations insufficient to establish that it was "patently obvious" that the County's failure to train its deputies regarding the confidentiality of booking photos would cause constitutional violations. In *Houston v. Maricopa County of Arizona*, the Ninth Circuit held that allegations that a county posted detainees' mugshots on a public municipal website stated a claim for a substantive due process violation. 116 F.4th 935, 940 (9th Cir. 2024). The court found that the plaintiff—a detainee who was never prosecuted—adequately alleged harm under the due process clause because the website "exposed [his] image and the fact of his arrest to the 'millions of strangers' able to access the Sheriff's public website online." *Id.* at 940 (quoting *Demery*, 378 F.3d at 1029). The court relied on the fact that the public website allowed an "'exponential number' of viewers worldwide" to access the plaintiff's mugshot by searching for his name. *Id.* at 941 (quoting *Demery*, 378 F.3d at 1029–30). Other cases in this Circuit concerning substantive due process and booking photos likewise involve public Internet postings by municipal entities—not text messages to individual people, like those alleged by Plaintiff. *See Morales v. City of Tucson*, No. CV-23-00498-TUC-BGM, 2024 WL 4475095, at *3 (D. Ariz. Oct. 11, 2024); *Ross v. Cnty. of Lake*, No. 24-cv-09475-JSC, 2025 WL 2259003, at *6 (N.D. Cal. Aug. 7, 2025).

3:25-cv-01950-WQH-DEB

Plaintiff alleges that County deputies texted his booking photo to at least one of his colleagues at the federal law enforcement agency where they work.[10] (Compl. ¶ 44.) Unlike the plaintiff in *Houston*, Plaintiff does not allege that Does 13–14's actions allowed anyone besides his coworkers to view his booking photo—let alone an "exponential number" of Internet users worldwide. *Houston*, 116 F.4th at 941. And although Plaintiff alleges that his booking photo became a "widely circulated meme" at his workplace, Compl. ¶ 51, he does not specify the breadth of this circulation or that the circulation expanded beyond employees of law enforcement agencies.

The Court finds that Plaintiff fails to sufficiently allege that constitutional violations were a "patently obvious" result of the County's failure to train its deputies on the dissemination of booking photos. Accordingly, Plaintiff fails to state a claim for *Monell* municipal liability against the County on a failure to train theory. The Court declines to rule at this stage of the proceedings on whether texting a detainee's booking photo to a third party at a different law enforcement agency categorically violates the Due Process Clause.

### iv.    Deficient Policy

The County contends that Plaintiff fails to allege that its policy regarding booking photos and social media was the moving force behind his injury. (ECF No. 9-1 at 13–14.) Plaintiff contends that the County's policy "was grossly deficient on its face because it fails to accurately reflect" that California law prohibits deputies from disseminating booking photos over text message, in addition to posting them on social media. (ECF No. 13 at 12.) Plaintiff contends that because the County's policy refers to "*postings* to social media," it fails to give deputies "clear guidance" that the law prohibits texting booking photos. *Id.* at 14–15. Lastly, Plaintiff contends that the County's failure to amend its policy to also prohibit sending booking photos via text message constitutes deliberate indifference to

---

[10] The Court takes judicial notice of the Government Claim Plaintiff submitted to the County, which states that Plaintiff and his coworkers work at the Department of Homeland Security. (ECF No. 9-2 at 9.)

Plaintiff's constitutional rights. *Id.* at 16. In response, the County notes that the challenged policy explicitly requires employee social media use to comply with other laws relating to disseminating confidential information. (ECF No. 9-1 at 14.)

To show that a municipality's failure to enact a policy constitutes deliberate indifference, a plaintiff "must demonstrate that [the municipality] was on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao v. Desert Palace*, 698 F.3d 1128, 1145 (9th Cir. 2012) (quotations and citations omitted). "[A] plaintiff must also show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation." *Id.* (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)).

Plaintiff alleges that the County "maintained a deficient written policy that failed to comply with the state law under Penal Code § 13665 and § 632.01" because it "failed to prohibit texting of booking photographs." (Compl. ¶ 215.) Plaintiff further alleges that because the County knew that its deputies access booking photos frequently, it had notice that "the absence of a policy prohibiting dissemination of booking photographs via text message would likely result in violations of [detainees'] constitutional rights." *Id.* ¶ 156.

The challenged County policy states: "Employees are instructed to be sure that their use of social media complies with all laws and with other policies, particularly those relating to the dissemination of confidential information . . . Social media includes, but is not limited to, Facebook, Twitter, LinkedIn, Nixle, Wikipedia, blogs, etc." San Diego County Sheriff's Department Policy 7.14.[11] The policy does not include text messages or emails in its definition of "social media."

The Court finds that Plaintiff "has not plausibly alleged that this is a situation in which 'the need for more or different' action [by the County] was 'so obvious' that [it] can infer deliberate indifference from the text of the policy alone." *Hyun Ju Park*, 952 F.3d at

---

[11] *7.14 Social Media*, San Diego County Sheriff's Office – Policy Section, https://www.sdsheriff.gov /home/showpublisheddocument/9365/638880924367530000%20at%2067 (accessed March 9, 2026).

3:25-cv-01950-WQH-DEB

1143 (quoting *Canton*, 489 U.S. at 390). First, the policy's definition of social media is non-exhaustive. It states that social media "includes, but is *not limited to*" a list of social media forms, and ends that list with the phrase "etc." San Diego County Sheriff's Department Policy 7.14 (emphasis added). The policy does not obviously omit text messages from its list of prohibited communication forms. Additionally, the policy requires County employees to follow "all laws" and "other policies" related to the "dissemination of confidential information." "All laws" encompasses California Penal Code § 13665, which prohibits sharing booking photos via text message. The Complaint fails to establish that the County's policy caused Plaintiff's injury or that the County's failure to amend the policy constituted deliberate indifference to Plaintiff's rights. *See Tsao*, 698 F.3d at 1145–46. Accordingly, Plaintiff fails to state a *Monell* claim against the County on a deficient policy theory. The County's Motion to Dismiss (ECF No. 9-1) is granted as to the *Monell* claim.

### B. Section 1983 Supervisory Liability

The Supervisor Defendants move to dismiss Plaintiff's § 1983 claims for failure to supervise and discipline against them. (ECF No. 16-1 at 8–17.)

#### 1. Legal Standard

Under § 1983, supervisory officials "may not be held liable [in their individual capacities] for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Iqbal*, 556 U.S. at 676. Instead, the (1) the supervisor must have been "person[ally] involve[d] in the constitutional deprivation," or (2) a "sufficient causal connection [must exist] between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989). In other words, "a supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quotations and citations omitted).

3:25-cv-01950-WQH-DEB

### 2. *Defendant Wahl*

Defendant Wahl contends that Plaintiff fails to state a claim for supervisory liability against him because "Plaintiff does not allege [that Defendant Wahl] personally participated in the violations, was causally connected to the violations, or was deliberately indifferent to Plaintiff's rights." (ECF No. 16-1 at 10.) Defendant Wahl contends that Plaintiff's allegations against him are conclusory, "generalized assertions" and "untethered from Plaintiff's injuries." *Id.* at 10–11. Defendant Wahl further contends that many of the allegations of prior SDPD misconduct predate his appointment as Chief of Police, so he was not the SDPD's final policymaker when those events occurred. *Id.* at 11.

Plaintiff responds that Defendant Wahl served on the SDPD for 26 years before he became Chief and contends that he was the SDPD's final policymaker when several incidents of the Bike Team using excessive force against Black men occurred. (ECF No. 18 at 9.) Plaintiff further contends that Defendant Wahl had "personal awareness" of these incidents and "condoned and acquiesced in [the] abusive behavior" by promoting the offending officers, instead of retraining or disciplining them. *Id.* at 9.

Because Plaintiff does not allege that Defendant Wahl was personally involved in Plaintiff's arrest, detention, or treatment, he must establish a causal connection between Defendant Wahl's actions and Plaintiff's injury to state a supervisory liability claim. *See Hansen*, 885 F.2d at 646. A causal connection "can be established . . . by setting in motion a series of acts by others . . . or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) (quoting *Dubner v. City of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

For instance, in *Starr*, the Ninth Circuit found that the plaintiff stated a supervisory liability claim against the sheriff because the sheriff knew about and acquiesced in unconstitutional conditions in county jails. *Starr*, 652 F.3d at 1216. In that case, the plaintiff pled detailed facts demonstrating that the sheriff received notice about the jail conditions through several DOJ reports, weekly Special Counsel reports, a DOJ Memorandum of

3:25-cv-01950-WQH-DEB

Understanding signed by the sheriff, civil settlements, and personal knowledge of several similar inmate killings in the jails. *Id.* at 1209–11. The Ninth Circuit found these allegations sufficient to establish supervisory liability as to Plaintiff's § 1983 claim related to conditions of confinement because the plaintiff "specifically allege[d] that Sheriff Baca was given notice of" prior inmate deaths and, "in several reports, of systematic problems in the county jails under his supervision that have resulted in these deaths and injuries." *Id.* at 1216.

Plaintiff's allegations concerning Defendant Wahl are far less detailed and specific than the allegations against the sheriff in *Starr*. Plaintiff alleges that Defendant Wahl worked for the SDPD for 26 years, served as Assistant Chief from September 2023 to June 2024, and became Chief of Police on June 7, 2024. (Compl. ¶ 10.) Plaintiff alleges that Defendant Wahl was "intimately familiar with the multiple allegations by his own employees that there had been a long tradition of covering up misconduct only to promote the bad actors" and a "code of silence" within the SDPD but did nothing. *Id.* ¶¶ 145, 191. Plaintiff further alleges that Defendant Wahl "failed to supervise police officers to prevent, deter, and punish the unconstitutional and excessive use of force." *Id.* ¶ 185. He alleges that Defendant Wahl knew about the SDPD's "pattern of charging innocent people with resisting arrest in order to cover up" violations, "condoned and acquiesced in" officer misconduct, and took no action to ensure offending officers received discipline. *Id.* ¶¶ 192, 193, 196.

Unlike the allegations in *Starr*, which provided detailed facts about the sheriff's knowledge of constitutional violations in jails, Plaintiff's allegations largely restate the relevant legal standards and offer minimal facts about Defendant Wahl's individual actions or omissions. Regarding the alleged prior incidents of excessive force and false arrest in downtown San Diego, *see* Compl. ¶¶ 55–64, Plaintiff fails to sufficiently allege Defendant Wahl's personal connection to these incidents. Several of these incidents allegedly occurred before Defendant Wahl became Assistant Chief or Chief. And Plaintiff fails to identify Defendant Wahl's connection to the more recent incidents beyond the conclusory

allegation that the "Department was well aware" of these incidents and "took no action." *Id.* ¶¶ 52, 62.

The Court concludes that Plaintiff's allegations are too conclusory and vague to adequately allege that Defendant Wahl's conduct caused Plaintiff's injury. *See Est. of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1213 (E.D. Cal. 2019) (dismissing individual supervisory liability claim against police chief where complaint failed to "differentiat[e] in any way" the chief's conduct "from that of the City or the Police Department"). Accordingly, the Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) is granted as to the § 1983 claim against Defendant Wahl.

### 3. *Defendants Smith and Bull*

Defendants Smith and Bull raise similar arguments as Defendant Wahl. (ECF No. 16-1 at 12.) They contend that Plaintiff fails to allege that they "set in motion" or "knowingly refused to terminate" acts from subordinates that caused Plaintiff's injuries. *Id.* at 12. Plaintiff contends that he alleges that Defendants Smith and Bull were present during his arrest, and thus personally involved in his injury. (ECF No. 18 at 8.) In response, Defendants Smith and Bull contend that Plaintiff's allegation relating to their presence at his arrest is conclusory because Plaintiff bases that allegation "on information and belief." (ECF No. 18 at 12–13.)

First, Plaintiff alleges "on information and belief" that Defendants Smith and Bull—supervisors of the SDPD Bike Team—were "present during" his arrest and detention and "either participated in the arrest or permitted their subordinates to arrest" and use unlawful force against Plaintiff. *Id.* ¶¶ 11, 28, 186. Courts in this Circuit have found similar allegations too conclusory to state a claim for supervisory liability. For instance, in *Rosales v. County of San Diego*, the plaintiff in an excessive force case alleged that his injury "happened in the presence of multiple [sheriff's] deputies who responded to the scene," including one sergeant "who did nothing to stop his deputies from engaging in [] wrongful conduct." Case No. 3:19-cv-02303-JLS (LL), ECF No. 1 ¶ 58 (S.D. Cal. Dec. 3, 2019). The *Rosales* court held that the plaintiff "failed to allege any specific and non-conclusory

3:25-cv-01950-WQH-DEB

facts showing that [the sergeant] personally participated in the alleged violations." 511 F. Supp. 3d 1070, 1085 (S.D. Cal. 2021). And in *Chavez v. United States*, the Ninth Circuit deemed the plaintiff's allegations that Border Patrol supervisors "personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted" unconstitutional traffic stops "wholly conclusory" and insufficient to state a claim for supervisory liability. 683 F.3d 1102, 1110 (9th Cir. 2012). The Court likewise finds that Plaintiff fails to sufficiently allege that Defendants Smith and Bull were personally involved in his constitutional injury.

The Court next assesses whether Plaintiff adequately alleges a causal connection between the conduct of Defendants Smith and Bull and his injury. *See Hansen*, 885 F.2d at 646. Plaintiff alleges "on information and belief" that Defendants Smith and Bull "were well aware of" the Bike Team's prior incidents of excessive force and false arrest against Black men in downtown San Diego, "were present during these unlawful arrests," and "failed to properly supervise or intervene." *Id.* ¶ 65. He alleges that Defendants Smith and Bull "knew or should have known of the dangerous and racist propensities of the [Bike Team] from their personal experience with the same officers but took no steps to supervise [the officers]" or correct or discourage their use of authority. *Id.* ¶ 187. Lastly, Plaintiff alleges that when footage of the prior incidents "was provided to" Defendants Smith and Bull, they "blamed the victims and covered up for their officers." *Id.* ¶ 188.

As with the claim against Defendant Wahl and unlike the plaintiff in *Starr*, the Court finds that Plaintiff fails to allege specific, non-conclusory facts regarding Defendants Smith and Bull's involvement in, knowledge of, and acquiescence in prior constitutional violations by the SDPD. For the same reasons as discussed above, the Court grants the Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) as to the § 1983 supervisory liability claims against Defendants Smith and Bull.

## C. Negligence

### 1. Legal Standard

To establish negligence under California law, "a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate

or legal cause of the resulting injury." *Nally v. Grace Cmty. Church*, 763 P.2d 948, 956 (Cal. 1988).

### 2. The City

Plaintiff brings a negligence claim against the city on a theory of vicarious liability. (Compl. ¶ 226.)

The City contends that it cannot be held vicariously liable for the Supervisor Defendants' actions because the Supervisor Defendants are not personally liable for negligence. (ECF No. 15-1 at 29.) Plaintiff contends that the Supervisor Defendants acted negligently, creating respondeat superior liability for the City. (ECF No. 17 at 17.) The City also contends that it cannot be held vicariously liable for the Doe Defendants' actions because Plaintiff does not bring specific negligence allegations against the Doe Defendants. (ECF No. 15-1 at 29.) Plaintiff contends that he "alleges in specific detail how the Doe Defendants wrongfully detained and falsely arrested and then subjected him to excessive force," which is sufficient to state a negligence claim against the Doe Defendants. (ECF No. 17 at 17.)

California Government Code § 815 states: "except as otherwise provided by statute[,] [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815. However, § 815.2 provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." *Id.* § 815.2.

"[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1348 (Cal. 1991) (collecting cases). Under California law, a police officer "owes a duty of reasonable care to the arrestee" once he is in custody. *Frausto v. Dep't of Cal. Highway Patrol*, 267 Cal. Rptr. 3d 889, 906 (Cal. Ct. App. 2020).

Plaintiff alleges that SDPD officers arrested him, handcuffed him, and placed him into a transport van without securing him to the interior of the van or the seat. (Compl. ¶¶ 24, 29–32.) Plaintiff alleges that the officers accelerated the van at a high rate of speed and then abruptly stopped it, "forcibly toss[ing]" him onto the van floor. *Id.* ¶ 33. Plaintiff alleges that he landed on his back and shoulder "while handcuffed and unable to brace himself." *Id.* Plaintiff further alleges that he experienced "extreme pain in his right shoulder and chest area" hours after the "rough ride" and that he had a fractured shoulder when he left the Jail. *Id.* ¶¶ 47, 50. Plaintiff brings his excessive force claim against Does 6–7, who are unidentified SDPD officers. *Id.* at 32.

The Court finds that Plaintiff's allegations support the reasonable inference that Does 6–7 owed a duty of reasonable care to Plaintiff, they breached that duty by subjecting Plaintiff to a "rough ride," and their breach caused Plaintiff's injury. Because Does 6–7 acted in the scope of their employment when they injured an arrestee while transporting him to the Jail, Plaintiff sufficiently alleges that the City can be held vicariously liable for Does 6–7's negligence. The City's Motion to Dismiss (ECF No. 15-1) is denied with respect to the negligence claim.

### 3. *Supervisor Defendants*

#### i.   Defendant Wahl

Plaintiff brings a negligent training and supervision claim against Defendant Wahl. (Compl. ¶ 224.)

Defendant Wahl contends that because Plaintiff does not allege that he personally interacted with Plaintiff, he did not owe Plaintiff a duty. (ECF No. 16-1 at 18.) Defendant Wahl contends that Plaintiff fails to allege that a special relationship existed between himself and Plaintiff. *Id.* Defendant Wahl further contends that Plaintiff fails to state a negligent supervision and training claim against him because Plaintiff does not allege that he had prior knowledge of Doe Defendant officers' "dangerous propensity" to commit misconduct. *Id.* at 20–21. Plaintiff contends that Defendant Wahl owed a "duty of ordinary care in training and supervising [] subordinates" because he "was specifically aware of the

31

3:25-cv-01950-WQH-DEB

dangerous propensities of the Bike Team officers of using excessive force" against Black men. (ECF No. 18 at 14.)

Plaintiff does not allege that Defendant Wahl personally participated in his arrest, detention, or treatment. Plaintiff instead alleges that the Supervisor Defendants "failed to act with ordinary care in failing to properly train and supervise their officers with respect to proper procedures on detention and arrest of citizens and the use of force." (Compl. ¶ 224.) The Court construes this as a negligent training and supervision claim.

"[W]here the Chief of Police is not directly involved in the incident, any 'claims against the Chief for negligent training, retention, hiring, etc. are in reality a direct claim against the City[.]'" *Sandoval ex rel. B.U. v. City of National City*, No. 22CV1657-GPC(AGS), 2023 WL 3295590, at *12 (S.D. Cal. May 5, 2023) (citation omitted); *see also Berman v. Sink*, No. CV F 13-0597 LJO SAB, 2013 WL 2360899, at *16 (E.D. Cal. May 29, 2013) (collecting cases). "[A] direct claim against a governmental entity asserting negligent hiring and supervision, when not grounded in the breach of a statutorily imposed duty owed by the entity to the injured party, may not be maintained." *de Villers v. Cnty. of San Diego*, 156 Cal. App. 4th 238, 266 (Cal. Ct. App. 2007).

Additionally, "California law does not recognize a general duty of care on the part of supervisors with respect to negligent hiring, retention, or training" unless the supervisors have a "special relationship" with the injured party. *Est. of Osuna v. Cnty. of Stanislaus*, 392 F. Supp. 3d 1162, 1182 (E.D. Cal. 2019) (citing *C.A. v. William S. Hart Union High Sch. Dist.*, 270 P.3d 699, 709 (Cal. 2012)). Here, Plaintiff fails to allege that he had a special relationship with Defendant Wahl. *See id.* (collecting cases declining to find a special relationship between plaintiffs and sheriffs or police chiefs). Accordingly, the Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) is granted as to the negligence claim against Defendant Wahl.

ii.   Defendants Smith and Bull

Plaintiff brings a negligent training and supervision claim against Defendants Smith and Bull. (Compl. ¶ 224.)

3:25-cv-01950-WQH-DEB

Defendants Smith and Bull make the same arguments as Defendant Wahl regarding Plaintiff's negligence claims against them. (ECF No. 16-1 at 19.) Plaintiff contends that because Defendants Smith and Bull were present during his arrest, they breached their duty to Plaintiff by "participating in the unlawful conduct themselves in falsely arresting [Plaintiff] or by permitting their subordinates to do so." (ECF No. 18 at 14.) Plaintiff contends that Defendants Smith and Bull had a duty to supervise and train their Bike Team subordinates with ordinary care and breached that duty because they were "personally aware of the dangerous propensities of their employees and yet failed to take action." *Id.*

Plaintiff alleges that Defendants Smith and Bull "failed to act with ordinary care in failing to properly train and supervise their officers with respect to proper procedures on detention and arrest of citizens and the use of force." (Compl. ¶ 224.) As discussed in Section IV(B)(3), Plaintiff fails to sufficiently allege that Defendants Smith and Bull were personally involved in Plaintiff's arrest, detention, or treatment. Plaintiff fails to allege the existence of a special relationship between himself and Defendants Smith and Bull, and thus fails to state a claim for negligent training and supervision against those Defendants. The Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) is granted with respect to the negligence claims against Defendants Smith and Bull.

### 4. *The County*

Plaintiff appears to rely on three theories to support his negligence claims against the County: (1) direct negligence per se liability for failure to discharge a mandatory duty, (2) vicarious negligence per se liability based on Does 13–14's violation of California Penal Code § 13665, and (3) vicarious common law negligence liability based on Does 13–14's dissemination of Plaintiff's booking photo.

### iii.   Direct Liability – Negligence Per Se

The County contends that Plaintiff fails to state a direct negligence per se claim against the County because "nothing in the language of Penal Code Section 13665 provides for a private right of action in civil court." (ECF No. 9-1 at 17.) Plaintiff contends that § 13665 imposes a "mandatory duty" on the County that provides a basis for a negligence

3:25-cv-01950-WQH-DEB

per se claim, so a private right of action is not required. (ECF No. 13 at 20–21.) In response, the County contends that § 13665 does not impose a mandatory duty. (ECF No. 14 at 6–8.)

California Government Code § 815.6 states:

> Where a public entity is under a *mandatory duty* imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Cal. Gov't Code § 815.6 (emphasis added).

Plaintiff alleges that "Does 13–14 were under a statutory duty to comply with California Penal Code § 13665" and violated that statute when they texted Plaintiff's booking photo to his coworkers. (Compl. ¶¶ 229, 231.) Plaintiff further alleges that the County is "vicariously liable for the negligent conduct of its employees." *Id.* ¶ 233. In his Opposition brief, Plaintiff contends for the first time that the County is *directly* liable under Government Code § 815.6 for "failure to discharge a mandatory duty." (ECF No. 13 at 20.) However, the Complaint does not allege that § 13665 imposed a mandatory duty on the County. (*See* Compl. ¶¶ 228–34.) In evaluating a 12(b)(6) motion, courts "may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis and citation omitted). The Court concludes that Plaintiff fails to adequately allege a direct negligence per se claim against the County for failure to discharge a mandatory duty imposed by § 13665.

### iv.    Vicarious Liability – Negligence Per Se

The County contends that Plaintiff's allegations that Does 13–14 violated § 13665 are conclusory. (ECF No. 9-1 at 17.)

California Penal Code § 13665 provides that:

> A police department or sheriff's office shall not share, on social media, booking photos of an individual arrested on suspicion of committing a nonviolent crime unless any of the following circumstances exist: (1) A police

department or sheriff's office has determined that the suspect is a fugitive or an imminent threat . . . (2) A judge orders the release or dissemination of the suspect's image . . . [or] (3) . . . an exigent circumstance [] necessitates the dissemination of the suspect's image in furtherance of an urgent and legitimate law enforcement interest.

Cal. Penal Code § 13665(a). The statute defines "social media" as "an electronic service or account, or electronic content, including, but not limited to, videos or still photographs, blogs, video blogs, podcasts, instant and *text messages*, email, online services or accounts, or Internet Web site profiles or locations." *Id.* § 13665(d)(2); *id.* § 632.01(a)(1) (emphasis added).

As discussed in Section IV(A)(3)(ii), Plaintiff adequately alleges that Does 13–14 texted Plaintiff's booking photo to Plaintiff's coworkers. Plaintiff further alleges that "no compelling public safety or law enforcement interest" justified texting his booking photo because he was arrested for the nonviolent offense of "being drunk in public," he "posed no imminent threat to public safety and was already in law enforcement custody," and "no judge ordered the release of the image." (Compl. ¶ 257.) The Court finds that Plaintiff adequately pleads that Does 13–14 violated California Penal Code § 13665.

The Court next considers whether Plaintiff sufficiently alleges a presumption of negligence per se based on Does 13–14's violation of § 13665. "[T]he doctrine of negligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence." *Turner v. Seterus, Inc.*, 238 Cal. Rptr. 3d 528, 543 (Cal. Ct. App. 2018) (quotations and citation omitted). A plaintiff establishes a rebuttable presumption of negligence by showing:

> (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

*Quiroz v. Seventh Ave. Ctr.*, 45 Cal. Rptr. 3d 222, 244 (Cal. Ct. App. 2006) (citing Cal. Evid. Code § 669).

As discussed, Plaintiff adequately alleges that Does 13–14 violated § 13665, which caused Plaintiff's injury. The statute was adopted to protect the privacy of individuals who, like Plaintiff, have been arrested and booked on suspicion of committing a nonviolent crime. The question remaining is whether § 13665 was designed to prevent Does 13–14's conduct. The County contends that the California Legislature intended § 13665 to apply only to "traditional social media platforms such as Facebook or Instagram," not text messages. (ECF No. 14 at 7.) However, the statute itself includes "text messages" in its definition of social media. Cal. Pen. Code §§ 13665(d)(2), 632.01(a)(1). Accordingly, the Court concludes that Plaintiff adequately pleads a rebuttable presumption of negligence based on Does 13–14's conduct. As discussed below, the County can be held vicariously liable for Does 13–14's negligence. The County's Motion to Dismiss (ECF No. 9-1) is denied as to Plaintiff's negligence per se theory.

### v.   Vicarious Liability – Common Law Negligence

Plaintiff also brings a common law negligence claim against the County under a vicarious liability theory. (Compl. ¶¶ 220–27.) The County contends that it cannot be held vicariously liable for the conduct of Does 13–14 because California Government Code § 844.6 provides that vicarious liability of public entities does not apply in cases involving injuries to prisoners. (ECF No. 9-1 at 16.) Plaintiff contends that the rule granting immunity for injuries to prisoners does not apply here because Plaintiff "has not alleged, because he does not know, the date and time the booking photos were texted to his colleagues." (ECF No. 13 at 21–22.)

California Government Code Section 844.6 provides in relevant part that "a public entity is not liable for . . . an injury to any prisoner." Cal. Gov't Code § 844.6(a). "Although a public entity may be vicariously liable for the acts and omissions of its employees . . . that rule does *not* apply in the case of injuries to prisoners," subject to some exceptions that do not apply here. *Lawson v. Superior Ct.*, 103 Cal. Rptr. 3d 834, 844 (Cal. Ct. App. 2010).

The Court assesses whether Plaintiff constitutes a "prisoner" under California law. California Government Code § 844 states that "a lawfully arrested person who is brought

36

3:25-cv-01950-WQH-DEB

into a law enforcement facility for the purpose of being booked . . . becomes a prisoner . . . upon his or her initial entry into a prison, jail, or penal or correctional facility, pursuant to penal processes." Cal. Gov't Code § 844. "[A] person need not be lawfully arrested to qualify as a prisoner under [Section] 844.6." *Holland v. City of San Francisco*, No. C10-2603 THE, 2010 WL 5071597, at *9 (N.D. Cal. Dec. 7, 2010). Individuals who have not yet entered a correctional facility or who are "on the way out of prison are not prisoners and are not, therefore, barred from bringing a tort action against a public entity." *Fearon v. Dep't of Corr.*, 209 Cal. Rptr. 309, 311 (Cal. Ct. App. 1984).

Plaintiff alleges that, "[o]n or around January 1, 2025, Does 13–14 violated Penal Code § 13665 when [they] accessed [Plaintiff's] booking photo via JIMS and distributed it via text message." (Compl. ¶ 231.) Plaintiff must have already had his booking photo taken before Does 13–14 allegedly sent it to his coworkers. However, because Plaintiff does not plead an exact time when the alleged violation occurred, it is possible that Does 13–14 disseminated the booking photo after Plaintiff was released from the Jail. After his release, Plaintiff would no longer be considered a "prisoner" under § 844.6, and the County could be held liable for his injury. *See Fearon*, 209 Cal. Rptr. at 311. Because the Court must construe the allegations in the light most favorable to Plaintiff at the motion to dismiss stage, *Manzarek*, 519 F.3d at 1031, the Court assumes for the purposes of ruling on this motion only that Plaintiff was no longer a "prisoner" when Does 13–14 disseminated his booking photo. The Court concludes that § 844.6 immunity does not bar Plaintiff's negligence claim against the County at this stage of the proceedings.

The County further contends that Plaintiff's vicarious liability negligence claim fails because Plaintiff "identifies no statutory basis for holding the County, a public entity, directly liable for negligence." (ECF No. 9-1 at 17.) Plaintiff contends that California Government Code § 815.2 provides a statutory basis for holding the County vicariously liable for the conduct of Does 13–14. (ECF No. 13 at 21.) Plaintiff does not cite § 815.2 in the "negligence" section of his Complaint. (Compl. ¶¶ 220–27.) But elsewhere in the Complaint, he alleges that, "[p]ursuant to Gov. Code, § 815.2, the County is liable for

injuries proximately caused by acts or omissions of their employees within the scope of their employment." *Id.* ¶ 262. Although California law requires plaintiffs to identify the "statute or 'enactment' claimed to establish the duty," *Searcy v. Hemet Unified Sch. Dist.*, 223 Cal. Rptr. 206, 212 (Cal. Ct. App. 1986), "[p]leading in federal court is governed by Federal Rules of Civil Procedure, not state pleading requirements," *Miller v. Sawant*, 18 F.4th 328, 337 (9th Cir. 2021). Federal Rule of Civil Procedure 8(a)(2)'s notice pleading requirement "does not require a plaintiff to cite statutes in support of his or her claims for relief." *Essex v. Cnty. of Imperial*, No. 3:24-cv-00763-L-VET, 2025 WL 525110, at *8 (S.D. Cal. Feb. 18, 2025) (citation omitted). Plaintiff's failure to directly cite § 815.2 in the "negligence" section of his Complaint does not require dismissal of his negligence claim.

Plaintiff alleges that Does 13–14 are County employees who "accessed [Plaintiff]'s booking photograph while on duty and photographed and texted it to third parties," in violation of California law. (Compl. ¶¶ 44, 46.) Plaintiff alleges that "Does 13–14 were able to access and distribute the booking photo by virtue of their access to JIMS, gained through their employment with the Department." *Id.* ¶ 262. Plaintiff alleges that this conduct caused him ridicule, humiliation, and reputational harm. *Id.* ¶ 51.

The Court finds these allegations sufficient to hold Does 13–14 liable for negligence. Plaintiff cites California Government Code § 820, which provides that "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820(a); Compl. ¶ 222. "[A]s a general proposition one is required to exercise the care that a person of ordinary prudence would exercise under the circumstances." *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 884 P.2d 142, 144 (Cal. 1994) (quotation and citations omitted). The Court finds that Plaintiff sufficiently alleges that Does 13–14 had a duty to Plaintiff to act with ordinary care, they breached that duty by disseminating his booking photo without cause, and their breach caused Plaintiff harm.

The Court concludes that Plaintiff sufficiently alleges that the County is vicariously liable for Does 13–14's negligence. Under California law, an act occurs within the scope of employment if it is an "outgrowth" of the employment, "engendered by the

employment," or a "generally foreseeable consequence of the activity." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 362 (Cal. 1995) (quotations and citations omitted). Plaintiff adequately pleads that Does 13–14's access to and dissemination of Plaintiff's booking photo was an outgrowth of their employment with the County, and that they acted within the scope of their employment. Accordingly, Plaintiff states a claim for vicarious negligence liability against the County at this stage of the proceedings. The County's Motion to Dismiss (ECF No. 9-1) is denied as to the negligence claim on a vicarious liability theory.

### D. Bane Act

#### 1. Legal Standard

California Civil Code § 52.1 codifies the Tom Bane Civil Rights Act (the "Bane Act"), which creates a private right of action against any person who:

> interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . .

Cal. Civ. Code § 52.1(b).

"The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Cornell v. City & Cnty. of San Francisco*, 225 Cal. Rptr. 3d 356, 376 (Cal. Ct. App. 2017) (citing *Simmons v. Superior Ct.*, 212 Cal. Rptr. 3d 884, 893 (Cal. Ct. App. 2016)). The Bane Act "require[s] an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 949 P.2d 941, 943–44 (Cal. 1998).

In *Reese v. County of Sacramento*, the Ninth Circuit concluded that (1) "the Bane Act does not require the 'threat, intimidation, or coercion' element of the claim to be transactionally independent from the constitutional violation alleged," and (2) "the Bane

Act requires [ ] 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell*, 225 Cal. Rptr. 3d at 382–84). Specific intent can be established by showing that the defendant acted with reckless disregard for the plaintiff's constitutional rights. *Id.* at 1045.

### 2. *Supervisor Defendants*

The Supervisor Defendants contend that Plaintiff's Bane Act claim against them fails because Plaintiff does not adequately plead underlying constitutional violations committed by the Supervisor Defendants or allege "facts that these defendants had any specific intent to deprive Plaintiff of his constitutional rights." (ECF No. 16-1 at 7–8.) Plaintiff contends that he meets the Bane Act's intent requirement by alleging that the Supervisor Defendants acted with "reckless disregard" to cause Plaintiff's constitutional injury. (ECF No. 18 at 12.) Specifically, Plaintiff contends that Defendants Smith and Bull "were present during the incident and permitted, directed, or caused their subordinates" to violate Plaintiff's rights, and Defendant Wahl "fail[ed] to take any corrective action, which led to" Plaintiff's injury. *Id.* at 12–13.

"[A] successfully pled deliberate-indifference claim suffices to state a Bane Act claim because of the coercion, or specific intent, inherent in the deliberate-indifference standard." *Barry v. Cnty. of Riverside*, No. EDCV2101770JGBKKX, 2022 WL 2063247, at *7 (C.D. Cal. May 11, 2022) (collecting cases). When a plaintiff fails to adequately plead his constitutional deliberate indifference claim against a particular defendant, he must allege additional evidence of specific intent by that defendant to state a Bane Act claim. *See, e.g.*, *id.* at *7 (dismissing Bane Act claim because plaintiff failed to state a deliberate claim against the same defendants); *Campos v. Cnty. of Orange*, No. 8:23-cv-00072-WLH-JDEx, 2024 WL 4799879, at *6 (C.D. Cal. Feb. 27, 2024) ("[T]he Bane Act claim . . . rises or falls with the deliberate indifference claim.").

As discussed in Section IV(B), Plaintiff fails to adequately plead § 1983 supervisory liability claims against the Supervisor Defendants. To state a Bane Act claim against the Supervisor Defendants, Plaintiff must therefore allege additional evidence of specific

3:25-cv-01950-WQH-DEB

intent to violate his constitutional rights by those same Defendants. Plaintiff alleges that the Supervisor Defendants "violated [his] rights with the specific intent and purpose to deprive him of his enjoyment of those rights and of the interests protected by those rights. Each defendant acted with reckless disregard for [Plaintiff's] rights." (Compl. ¶ 249.) The Court finds this conclusory allegation insufficient to adequately allege specific intent by the Supervisor Defendants to violate Plaintiff's rights.

Plaintiff relies on *Greer v. County of San Diego* for the proposition that the Bane Act applies to supervisory defendants. 726 F. Supp. 3d 1058 (S.D. Cal. 2023); *see* ECF No. 18 at 13–14. In that case, the court stated that "a Bane Act claim can be brought against a sheriff based on his supervisory conduct." *Greer*, 726 F. Supp. 3d at 1085 (citing *Venegas v. Cnty. of Los Angeles*, 87 P.3d 1 (Cal. 2004)). However, the *Greer* court also allowed the § 1983 supervisory liability claims against the sheriff and other supervisory defendants to proceed past the summary judgment stage. *Id.* at 1080–82. Here, by contrast, Plaintiff fails to adequately allege § 1983 supervisory liability claims against the Supervisor Defendants. And because he does not sufficiently plead additional evidence of specific intent, Plaintiff fails to state a Bane Act claim against the Supervisor Defendants. The Court grants the Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) with respect to the Bane Act claim.

### E. Invasion of Privacy (California Constitution)

The County moves to dismiss Plaintiff's invasion of privacy claim under Article I, Section 1 of the California Constitution. The County contends that Plaintiff fails to allege that Does 13–14 invaded his privacy because the fact of Plaintiff's arrest is public information. (ECF No. 9-1 at 18.) Plaintiff contends that he has a right to privacy regarding his booking photo, which is not publicly available. (ECF No. 13 at 20.)

To state a claim for invasion of privacy under Article I, Section 1 of the California Constitution, a plaintiff must establish "that they have a legally protected privacy interest, a reasonable expectation of privacy under the circumstances, and a 'serious invasion' of privacy by the [County] that constitutes 'an egregious breach of the social norms

3:25-cv-01950-WQH-DEB

underlying the privacy right.'" *San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1178 (9th Cir. 2018) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 654–55 (Cal. 1994)). The right to privacy under the California Constitution does not "prohibit all incursion into individual privacy but [] any such intervention must be justified by a compelling interest." *Loder v. Mun. Ct.*, 553 P.2d 624, 628 (Cal. 1976) (citing *White v. Davis*, 533 P.2d 222, 234 (Cal. 1975)). The defendant bears the burden to "articulate a compelling state interest and to demonstrate that it is necessarily served by the policy." *Central Valley Chapter of the 7th Step Found., Inc. v. Younger*, 262 Cal. Rptr. 496, 506–07 (Cal. Ct. App. 1989) (citations omitted).

The right to privacy under the California Constitution protects against the "dissemination of information regarding arrests not resulting in convictions" without a compelling state interest. *Id.* at 499. The California legislature found that "publishing booking photos on social media when there is a low risk to public safety is detrimental to the right to a fair trial because it diminishes the presumption of innocence and potentially violates privacy rights of Californians without a commensurate benefit to public safety." 2021 Cal. Legis. Serv. Ch. 126, § 1(i) (A.B. 1475) (West). The legislature also defined "social media" to include text messages. Cal. Pen. Code §§ 13665(d)(2), 632.01(a)(1). And although the County's "Who's In Jail" website contains information about arrestees currently in jail, it does not publicize booking photos. (ECF No. 9-1 at 19.)

At this stage of the proceedings, the Court finds that Plaintiff adequately alleges that he had a legally protected privacy interest and reasonable expectation of privacy in his booking photo, and that Jail deputies' dissemination of the photo without cause constituted a serious invasion of his privacy. The County does not attempt to satisfy its burden of identifying a compelling state interest that would justify dissemination. The County's Motion to Dismiss (ECF No. 9-1) is denied with respect to Plaintiff's claim for invasion of privacy under the California Constitution.

**F. Leave to Amend**

3:25-cv-01950-WQH-DEB

Plaintiff seeks leave to amend to correct the pleading deficiencies identified in this Order. *See, e.g.*, ECF No. 13 at 22. Federal Rule of Civil Procedure 15 mandates that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (per curiam) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)). The Court grants Plaintiff leave to amend his Complaint to correct the deficiencies addressed in this order.

## V.    CONCLUSION

IT IS HEREBY ORDERED that the City's Motion to Dismiss (ECF No. 15-1) is denied. The Supervisor Defendants' Motion to Dismiss (ECF No. 16-1) is granted. The County's Motion to Dismiss (ECF No. 9-1) is granted as to the *Monell* claim and denied in all other respects. All dismissals are without prejudice and with leave to amend.

IT IS FURTHER ORDERED that Plaintiff may file an amended complaint within thirty (30) days of the filing of this Order. If no amended complaint is filed within (30) days, the County and the City shall file an answer to the Complaint within forty (40) days of the filing of this Order.

Dated:  March 26, 2026

William Q. Hayes

Hon. William Q. Hayes
United States District Court

43

3:25-cv-01950-WQH-DEB